## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BYRON A. REDMOND,

       **Plaintiff,**

v.

                                  **Case No. 16-cv-4021-DDC-KGS**

THE MIRROR, INC.,

       **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff brings this action against his former employer, alleging that defendant subjected him to disparate treatment, discharged him from his employment, and retaliated against him, violating Title VII (42 U.S.C. § 2000e-2), 42 U.S.C. § 1981, and the Kansas Acts Against Discrimination (Kan. Stat. Ann. § 44-1001, *et seq.*). Defendant has filed a Motion for Summary Judgment. Doc. 31. Plaintiff has responded to the Motion. Doc. 40. And, defendant has filed a Reply. Doc. 45. After considering the parties' arguments, the court grants defendant's motion in part and denies it in part. The court explains this ruling, below.

### I.    Facts

The following facts govern this motion and are uncontroverted or, where controverted, are recited in the light most favorable to plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Defendant is a non-profit residential reentry facility that contracts with the federal Bureau of Prisons ("BOP") to house and provide re-entry services to federal offender inmates as they make the transition back into society after incarceration. Defendant hired plaintiff on August 13, 2013, to work as a part-time Program Technician at its location in Topeka, Kansas. The job duties of a Program Technician involve daily monitoring of

federal offender clients and addressing their needs.  Part-time Program Technicians work a maximum of 20 to 25 hours a week on a varying schedule.

Mary Handley (Director of Federal Programs Northern Region) hired plaintiff and supervised him during his employment with defendant.  When Ms. Handley hired plaintiff, she knew that he intended to work full-time at another facility.  For this reason, she hired plaintiff as a part-time employee.  Ms. Handley also testified that she thought plaintiff's past experience at other residential facilities made him a desirable candidate for the Program Technician position.

On August 12, 2013, plaintiff signed the Program Technician job description and defendant's personnel policy acknowledgment page.  The policies that plaintiff acknowledged included the following:

> **Group 2** — The examples provided below should result in a written warning (a single somewhat more serious violation or a repeated violation or failure by the employee to affect a positive change on previously cited performance problems) and/or termination (if the seriousness of the violation warrants it or frequency of the violation adversely affects the quality of service provided by the agency).
>
> **Leaving Mirror work location without permission during working hours.**  Leaving the Mirror work site for personal reasons during regular working hours without notice to or permission from your immediate supervisor (or the program director or a Mirror administrator).
> **Disregard for safety rules.**  Neglect or carelessness in observance of established safety rules, resulting in exposure of other employees or clients to possible injury or damage, or resulting in actual injury to the employee or to other employees or clients or damage to Mirror property.  Examples of this might include the following: malicious mischief horseplay, other undesirable conduct or tampering in any way with safety equipment.
> **Insubordination.**  Insubordination is the refusal by an employee to perform work assigned to them or to comply with the written or verbal instructions of their supervisor (or an administrator).
> **Use of abusive or threatening, harassing language against clients or other staff persons.**
> **Sleeping or dozing during working hours.**

**Breaching federal or state confidentiality regulations (inclusive of CFR-42 or CFR-45).**
**Unsatisfactory work performance as related to AAPS Licensure Standards, BOP or other contract requirements.** (Employees that continue to fail to meet the required paperwork and proper procedure demands set forth in AAPS Licensure Standards, the BOP or other contracts may need to be disciplined and assisted with a corrective action plan to correct their inaccuracies in documentation).

Doc. 34-2 at 35. When defendant hired plaintiff, it placed him on an initial six-month probationary period. Plaintiff completed the probationary period.

### The "Float" Position

Defendant employs one Program Technician in the "float" position for each of its shifts. The "float" position exists to assist other workers during the course of a shift. Defendant expect floaters to work independently and with less supervision than other staff. Program Technicians assigned to work the "float" position do not receive additional pay for their work in this position.

In June 2014, Ms. Handley changed the work schedule so that full-time employee Kyle Weishaar was working in the "float" position during the 1:00 p.m. to 9:00 p.m. shift. Ms. Handley explained that she made this change to ensure that Mr. Weishaar, as a full-time employee with no other employment, was assigned 40 hours a week. Indeed, Ms. Handley is required to schedule defendant's full-time employees to work 40 hours per week.

On June 7, 2014, plaintiff sent an email to Ms. Handley, objecting to the schedule change. His email recited:

Mary, I feel it is very unfair to change the schedule without our knowledge! You are inconveniencing 3 people to appease 1 person, who if I'm not mistaken requested to work extra hours, which is overtime. I perceive this as Blatant Favoritism and the previous schedule should be honored. Approximately 4 months ago I recall you stating that you wanted techs who were mainly allowed the privilege to float to work the building to gain experience. I feel it is important that the techs who work the

3

buildings the majority of the time be given the opportunity to float as a reprieve break of not having the stress and responsibility of that task each work shift. As you know from working as a tech this past week it can become quite hectic at times. It will be beneficial to the morale and well being of all tech employees if they are allowed to float and all future schedules should reflect this change when Mr. King's employment begins and next month. Thanks to your attention concerning this manner. Byron Redmond.

Doc. 33-2 at 27.[1]

On June 7, 2014, Ms. Handley responded to plaintiff's email complaint. She told plaintiff that she was required to schedule full-time employees to work 40 hours a week. She also told plaintiff that she gave preference to employees whose primary employment was with defendant when she made the schedule. Ms. Handley also testified that sometimes, but not always, seniority plays a role in her scheduling decisions.

Throughout plaintiff's employment with defendant, he also held another full-time job with another employer. Also, during plaintiff's employment, defendant employed two part-time Program Technicians—Ronnie Arnold and Leroy Wycoff. Mr. Arnold and Mr. Wycoff both are African-American, and they also held full-time jobs with other employers during their part-time employment with defendant. Program Technician Leroy Wycoff did not consider the "float position" a desirable one. But, plaintiff testified that he wanted to work the float position

---

[1] Defendant has submitted its summary judgment exhibits in a manner that the court is not accustomed to seeing. Instead of providing each exhibit as a separate document filed on CM/ECF, defendant submitted only three exhibits—each exhibit includes excerpts from a deposition transcript. Attached to each transcript are various documents that the parties marked as exhibits during that deposition. In its summary judgment motion, defendant references these documents by deposition number and Bates number. But, they are difficult to locate in the summary judgment exhibits because two of the three exhibits span some 50 pages each and include several deposition exhibits. This unconventional practice has made the court's task more difficult than necessary and complicated the work required to identify the undisputed summary judgment facts.

because he thought it would allow him to go from working part-time to full-time.[2]  Plaintiff previously had told Ms. Handley that he wanted to work full-time for defendant.

### *Complaints about Plaintiff's Work Performance*

On June 12, 2014, two of defendant's employees, Britney Champagne and Kyle Weishaar, complained to Ms. Handley about plaintiff's behavior and job performance.  Ms. Champagne and Mr. Weishaar later sent an email to Ms. Handley, memorializing their complaints about plaintiff's performance.

On June 19, 2014, Program Technician Joe Scherr sent an email to Ms. Handley.  The email alleged that Mr. Scherr had caught plaintiff certifying that an inmate had completed his chores when he had not done so.  Mr. Scherr told Ms. Handley that plaintiff was not checking to ensure that inmates were completing chores.

### *Defendant Disciplines Plaintiff for Falsifying Residential Headcount Sheets*

Defendant requires Program Technicians to conduct routine headcounts of residents. This requires the Program Technician to record on the headcount sheets that he or she has seen each resident in each hour.  Plaintiff concedes that his job duties required him to conduct a complete and accurate headcount of all residents at least every hour.

On August 31, 2014, plaintiff was assigned to work Building 4 from 7:30 a.m. to 3:30 p.m.  Plaintiff recorded on his headcount sheet that resident T.B. was present in the facility at 11:40 a.m., 12:45 p.m., 1:40 p.m., 2:45 p.m., and 3:15 p.m.  Program Technician Robert Toeller relieved plaintiff from his shift at 3:30 p.m.  Mr. Toeller was scheduled to work Building 4 from 3:30 p.m. to 11:30 p.m.  When Mr. Toeller conducted a routine headcount around 5:00 p.m., he could not find resident T.B.  Mr. Toeller tried to find the resident's location using defendant's

---

[2]     The summary judgment record shows that this was plaintiff's belief.  But nothing in the summary judgment evidence confirms his belief.  That is, plaintiff cites no evidence showing that if he worked in the float position on a part-time basis, defendant eventually would convert him to full-time employment.

GPS monitoring system, and he determined that T.B. had cut or removed his GPS monitoring strap at 11:00 a.m.  After searching the premises, defendant's employees eventually found the strap of T.B.'s GPS monitoring device in his locker.

Program Technician Leroy Wycoff is responsible for GPS monitoring of defendant's inmate residents.  Mr. Wycoff received training on defendant's GPS monitoring system through a company known as Veritracks.  Defendant provides simple instructions to its resident inmates about the GPS monitors.  Defendant attaches the GPS monitoring straps to the residents' ankles, and it forbids them from removing the units.  Defendant also instructs the inmate residents to charge the units for one hour each day.  Veritracks sends alerts by text message to Mr. Wycoff and Ms. Handley's cell phones when a resident's GPS monitoring strap has "really low" battery power or when someone cuts or removes the GPS monitoring strap.  Mr. Wycoff estimates that Veritracks notifies defendant by text message alert within five minutes of an inmate cutting the device's strap.  Ms. Handley agrees that Veritracks sends an alert almost immediately but she notes that exceptions exist.  For example, if no one has "cleared" an earlier alert from the software system, then a new alert will not issue.  Doc. 40-3 (Handley Dep. 33:5–14).  Ms. Handley explained that "it's not a foolproof system."  *Id.*  Everyone who receives a text message alert about GPS monitoring shares responsibility for notifying employees at the facility about the alert.

Mr. Wycoff testified that he recalled receiving a text message alert from Veritracks on August 31, 2014, to notify defendant of a cut GPS monitoring strap.  Mr. Wycoff initially testified that he received the alert between 4:30 and 5:00.  He also testified that he recalled receiving the text alert as he was driving to work to start his shift at 5:00 p.m.  But later, Mr. Wycoff testified that he was not comfortable saying that he received the text alert after 4:00 p.m.

Instead, he explained, he would need to review the Veritracks system to determine the time he received the alert.

Defendant never determined when T.B. left the facility. T.B.'s roommate reported seeing T.B. in their room at 2:00 p.m. Mr. Wycoff is not aware of anyone reviewing video footage of the facility to determine when or how T.B. left the facility. Mr. Wycoff testified that defendant does not review video footage routinely, but he also testified that defendant could have done so to determine when T.B. absconded. Ms. Handley also testified that she never looked at video footage to determine when T.B. had left the facility, even though, she concedes, this would have allowed her to determine easily when T.B. actually absconded.

When Ms. Handley reviewed plaintiff's headcount sheet, she saw that plaintiff had marked T.B. present at both 2:45 p.m. and 3:15 p.m. At 8:58 p.m., Ms. Handley called plaintiff about T.B's escape. Ms. Handley testified that plaintiff told her during this phone call that he had not seen T.B since 2:35 p.m. But plaintiff testified that he told Ms. Handley that he last saw T.B. during his checks. Doc. 40-5 at 3 (Redmond Dep. at 57:13–58:14). Plaintiff concedes, however, that some confusion exists about what he said during the telephone call. Plaintiff was drinking alcohol that evening to celebrate the Labor Day holiday, and he believes he misunderstood what Ms. Handley was asking him. After talking on the phone with plaintiff, Ms. Handley believed that he had falsified the headcount sheet because he had told her that he last had seen T.B. at 2:35 p.m., but then marked him as present at both 2:45 p.m. and 3:15 p.m. When Ms. Handley reviewed Mr. Toeller's headcount sheet for August 31, 2014, she saw that Mr. Toeller correctly had noted T.B. as "absconded" from 5:00 p.m. until 11:00 p.m.[3]

---

[3]      Plaintiff asserts that Mr. Toeller (who is Caucasian) initially counted T.B. as present at the facility at 5:00 p.m. and 6:00 p.m. But the testimony he cites does not support this assertion. Instead, the headcount sheet states that T.B. had absconded from 5:00 p.m. until 11:00 p.m. No evidence suggests that Mr. Toeller submitted a headcount sheet that contained false information. Ms. Handley also testified

On September 2, 2014, Ms. Handley issued a written disciplinary action, placing plaintiff on a 60-day probationary period for falsifying headcount records. When presented with the disciplinary action, plaintiff objected that defendant was holding him accountable for a resident who was discovered missing at 5:00 p.m., but he had left the facility at the end of his shift around 3:40 p.m. Plaintiff also disagreed that the resident had cut his GPS monitoring strap at 11:00 a.m. because no one received an alert or notified the facility of an alert of a cut strap during his shift. Ms. Handley never explained to plaintiff why no one received an alert about a cut strap. Plaintiff also denied falsifying the headcount logs. He told Ms. Handley that T.B. was present when he did his checks. But, despite these protests about the discipline, plaintiff wrote on the bottom of the disciplinary action form: "I feel 30 days would be more appropriate for the situation." Doc. 33-2 at 29.

Ms. Handley knows of no other employee who falsified a headcount showing that a resident was present when, in fact, the employee had not seen the resident at the facility.[4] Ms. Handley does not discipline employees who correct their own headcount sheets before turning them into defendant. She acknowledged the employees often make corrections to the time sheets before submitting them to defendant.

Ms. Handley testified about one incident when a Program Technician erroneously reported a resident as present on his headcount sheet when the resident, in fact, had absconded. On this occasion, Ms. Handley received a GPS strap alert for inmate resident O.S. Ms. Handley called Program Technician Gerald Loney (who is Caucasian) at 1:15 a.m. to report the alert. She

_____

that no falsification occurs if an employee makes corrections to a headcount sheet before turning it in to defendant.

[4]     Plaintiff contends that Mr. Toeller falsified his headcount sheet, but the evidence he cites does not support this contention. Also, plaintiff conceded in his deposition that he "doesn't know" if Mr. Toeller falsified his headcount sheet. Doc. 33-2 at 16 (Redmond Dep. 192:5–8).

instructed Mr. Loney to look for him in the facility.  Mr. Loney conducted a headcount, and

found O.S. nowhere in the facility.  Mr. Loney began standard escape procedures, and he called

Ms. Handley back to inform her that the resident had escaped.  Mr. Loney's headcount sheet

shows that O.S. was present from 1:25 a.m. to 7:00 a.m.  But, it also shows that another resident,

Thomas, was present earlier, but missing from 1:25 a.m. to 7:00 a.m.  After reviewing the

headcount sheet on October 24, 2014, Ms. Handley believed that Mr. Loney erroneously marked

Thomas as absent instead of marking O.S.'s line on the headcount sheet.  During her tenure with

defendant, Ms. Handley has never had two residents abscond at the same time.

Gynger Jarboe (Head Program Technician) testified that defendant's policy requires

employees to conduct a headcount every hour, but she also acknowledged that other job duties

may prevent an employee from performing the headcount exactly on the hour.  Defendant never

disciplined Ms. Jarboe for failing to complete her headcounts correctly on a near-hourly basis.

But, Mr. Jarboe also never testified that she had falsified her headcounts at any time in her

employment.

### *Plaintiff's Performance Evaluation and Transfer to PRN Position*

On September 9, 2014, Ms. Handley completed plaintiff's annual Employee Performance

Evaluation.  Ms. Handley marked plaintiff's overall performance level as "Competent."  She also

included specific comments about issues that plaintiff needed to address, including:

(1) "follow[ing] the directives given by the Management staff and shared in staff meetings,

emails and the Com Log;" (2) attending staff meetings; and (3) communicating with staff about

his whereabouts.  Doc. 33-1 at 32–33.  But, Ms. Handley testified that plaintiff was entitled to

continue working for defendant based on his performance evaluation on September 9, 2014.

On October 5, 2014, defendant transferred plaintiff from a part-time Program Technician position to a PRN or "as needed" Program Technician position. Defendant made this transfer because the BOP recently had sanctioned it for failing to have the federally-required number of female employees working during all shifts. So, to comply with the federal requirements, defendant made changes to plaintiff's employee status and schedule.[5]

### Plaintiff is Disciplined for Allowing a Resident to Go Outside, Unsupervised

Ms. Handley came to defendant's facility on October 11, 2014, around 10:00 p.m., to cover a shift for another Program Technician. When she arrived, she saw a resident sitting outside. The resident was smoking, and the resident was unsupervised. Plaintiff was the Program Technician on duty at the time, working in the float position. Plaintiff knows that defendant prohibits residents from going outside without supervision. But, plaintiff contends, defendant was short-staffed at the time. Program Technician Leroy Wycoff was scheduled to work from 3:30 p.m. to 7:30 a.m., but Mr. Wycoff had called in absent. Plaintiff testified that he was working two jobs because he was the only Program Technician on duty at the time.

When Ms. Handley arrived at the facility and saw the resident smoking, plaintiff was inside the facility distributing medications. Plaintiff did not know that the resident had gone outside, unsupervised. Ms. Handley asked plaintiff what the resident was doing outside, and he told her that he didn't know the resident was outside because he was busy distributing medications.

On October 15, 2014, Ms. Handley issued plaintiff a written disciplinary action for allowing a resident to remain outside, unsupervised, in violation of policy. Plaintiff was upset

---

[5]     Plaintiff asserts no claims based on his transfer to another position. Plaintiff also asserts no claims based on his September 9, 2014 performance evaluation.

that Ms. Handley had disciplined him for this incident.  He told her that he couldn't believe she was writing him up when he was working two jobs at the same time.

***Plaintiff Misses a Staff Meeting***

Defendant held a mandatory staff meeting on October 30, 2014.  Plaintiff received notice of the meeting a week in advance.  Plaintiff knew that defendant requires employees to obtain permission to miss staff meetings before the meeting is held.  Indeed, plaintiff had sought and obtained permission to miss meetings in the past.  Plaintiff did not attend the October 30, 2014 meeting, and he never asked for permission to miss the meeting.  Plaintiff was unable to attend the meeting because he was working at his full-time job when the meeting occurred.

Mr. Wycoff testified that he was unable to attend staff meetings on occasion, and defendant never reprimanded or disciplined him for missing those meetings.  But, Mr. Wycoff never testified that he failed to obtain advance permission to miss the meeting before it occurred.  To the contrary, Mr. Wycoff testified that defendant knew he couldn't attend the meetings.

***Plaintiff's Termination***

On October 30, 2014, Ms. Handley and Gynger Jarboe (Head Program Technician) met with plaintiff and terminated his employment.  During the termination meeting, plaintiff attempted to provide Ms. Handley a document showing that he was distributing medications at 9:59 p.m. on October 11, 2014, when Ms. Handley had observed the resident outside smoking, unsupervised.  Ms. Handley did not look at the document, but instead she informed plaintiff of his termination.

Ms. Handley did not give plaintiff any written notice of his termination.  She also does not recall what reasons she provided for the termination other than mentioning that plaintiff was on probation at the time.  Defendant's articulated reason for terminating plaintiff's employment

was his failure to seek permission to miss the mandatory staff meeting and his continued poor performance while on probation.  Ms. Handley has disciplined other employees in the past for failing to attend mandatory meetings without permission.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When applying this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  A disputed "issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And an "issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party meets its initial burden, the non-moving party "'may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988,

990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248-49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)). To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. To the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

III.    **Analysis**

Plaintiff asserts disparate treatment and retaliation claims under Title VII, § 1981, and the Kansas Act Against Discrimination ("KAAD"). The court addresses each claim, separately, in the sections below.

A.     **Plaintiff's Disparate Treatment Claims**

The court analyzes plaintiff's Title VII, § 1981, and KAAD disparate treatment claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (applying *McDonnell Douglas* to Title VII claim); *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995) (applying *McDonnell Douglas* to Title VII and § 1981 discrimination claims); *Reber v.*

*Mel Falley, Inc.*, 683 P.2d 1229, 1230–32 (Kan. 1984) (adopting *McDonnell Douglas* framework for KAAD discrimination claims).

The *McDonnell Douglas* framework involves a three-step analysis. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002). First, a plaintiff must provide a prima facie case of discrimination. *Id.*; *see also Khalik*, 671 F.3d at 1192. A prima facie case of discrimination requires plaintiff to demonstrate that: (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the challenged action occurred under circumstances giving rise to an inference of discrimination. *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (citing *E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)). If plaintiff meets this burden, then the burden shifts to defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. *Khalik*, 671 F.3d at 1192 (citing *Garrett*, 305 F.3d at 1216). If defendant satisfies that burden, the burden then shifts back to plaintiff to show that plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext. *Id.* (citing *Garrett*, 305 F.3d at 1216).

Plaintiff asserts that defendant discriminated against him based on his race in four distinct ways: (1) defendant changed plaintiff's schedule in June 2014, removing him from the float position; (2) defendant placed plaintiff on 60 days' probation for falsifying a headcount sheet; (3) defendant issued plaintiff a written disciplinary action for allowing a resident to smoke outside and unsupervised; and (4) defendant terminated plaintiff on October 30, 2014. The court addresses each allegedly discriminatory act using the *McDonnell Douglas* burden-shifting framework below.

## 1. The Schedule Change

Plaintiff asserts that defendant discriminated against him when Ms. Handley changed the schedule in June 2014, removing plaintiff from the float position. Defendant argues that plaintiff cannot establish the second element of a prima facie case—that the schedule change constitutes an adverse employment action.

"Adverse employment action includes 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032–33 (10th Cir. 2004)). But, "'a mere inconvenience or an alteration of job responsibilities'" is not considered "'an adverse employment action.'" *Id.* (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)). Indeed, our Circuit has held that the denial of a transfer to a position with "the same salary and benefits . . . [and] substantially similar duties" was not "an adverse employment action" because the position was "a purely lateral transfer." *Sanchez*, 164 F.3d at 532. The Circuit explained: "If a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." *Id.* at 532 n.6.

Here, plaintiff has adduced no evidence that his reassignment from the float position involved a significant change in his conditions of employment. To the contrary, the undisputed evidence establishes that the "float" position has substantially similar job duties as a Program Technician working in a regular position—the only difference is that the floaters assist other positions and work more independently. The undisputed evidence also establishes that Program

Technicians working in the float position receive no additional pay. Plaintiff's complaints about the schedule change are based on his own perceptions of the float position, but, as the Circuit held in *Sanchez*, plaintiff's negative view about the schedule change does not make it an adverse employment action when it "involves no significant changes in the employee's conditions of employment." *Id.* at 532 n.6. The court thus concludes as a matter of law that the schedule change does not constitute an adverse action. As a consequence, plaintiff has failed to establish a prima facie case of discrimination.

But, even if plaintiff had established a prima facie case, defendant offers a legitimate, non-discriminatory reason for the schedule change. Ms. Handley explained that she made the change to ensure that a full-time employee was assigned to work 40 hours a week—as she is required to do. Plaintiff speculates that defendant's reason is pretext because Kyle Weishaar, the full-time employee Ms. Handley assigned to work in the float position, was assigned to work 40 hours a week in different shifts before the schedule change. But, plaintiff's speculation on this point cannot rebut Ms. Handley's testimony that she made the schedule change to accommodate this full-time employee so that he was assigned 40 hours of work each week. Plaintiff cannot establish pretext with such speculation. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (explaining that non-moving party must present evidence "based on more than mere speculation, conjecture, or surmise" to avoid summary judgment).

Plaintiff also argues that this reason is pretext because, even though he was a part-time employee, he had worked more than 40 hours a week and thus was similarly-situated to other full-time employees. Plaintiff offers no legal authority to support this argument either. It is undisputed that plaintiff was a part-time employee and that he held another full-time job with a different employer the entire time defendant employed him. It is also undisputed that that Kyle

Weishaar was a full-time employee. Plaintiff has adduced no evidence showing that Ms. Handley's reason for making the schedule change was pretext. Defendant is entitled to summary judgment on this claim.

## 2. Plaintiff's Discipline for Falsifying the Headcount Sheet

Plaintiff next asserts that defendant discriminated against him based on his race when Ms. Handley issued him a written disciplinary action, placing plaintiff on a 60-day probationary period for falsifying headcount records. Defendant does not dispute that plaintiff has established a prima facie case of discrimination. Defendant instead moves to the second step of the burden-shifting analysis, arguing a legitimate, nondiscriminatory reason supported its decision to impose the discipline. Defendant asserts that it disciplined plaintiff for falsifying his headcount sheets on August 31, 2014, because he had recorded resident T.B. present at the facility at 2:45 p.m. and 3:15 p.m. Ms. Handley asserts that she honestly believed that plaintiff had falsified the headcount sheet in violation of policy. And, based on this belief, she imposed the discipline.

Plaintiff asserts that defendant's reason for the discipline is pretext because disputed facts exist whether Ms. Handley honestly believed that plaintiff falsified the headcount sheet. To show pretext, plaintiff must produce evidence of "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *PVNF, LLC*, 487 F.3d at 805 (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006)). Plaintiff indeed has come forward with facts showing sufficient weaknesses in Ms. Handley's belief that plaintiff falsified his headcount sheet to survive summary judgment.

Defendant asserts that Ms. Handley honestly believed that plaintiff had falsified his headcount sheet because he had marked T.B. present at 2:45 p.m. and 3:15 p.m. but later told Ms. Handley in a phone conversation that he had last seen T.B. at 2:35 p.m. But, plaintiff disputes that he told Ms. Handley this information. Although plaintiff concedes that he may have misunderstood Ms. Handley's questions when she called him on the evening of August 31, 2014, because he had been drinking alcohol, plaintiff specifically testified that he told Ms. Handley during this phone conversation that he last saw T.B. during his checks. Doc. 40-5 at 3 (Redmond Dep. at 57:13–58:14). Plaintiff also disputed that he had falsified the headcount sheet when Ms. Handley presented him with the written discipline on September 2, 2014. He told Ms. Handley in that meeting that T.B. was present when he had completed his checks so his headcount sheet was accurate.

It is also undisputed that defendant never determined when T.B. actually had left the Mirror facility. Significant fact issues exist on this issue, and they could permit a reasonable jury to infer that T.B., in fact, was at the facility when plaintiff performed his checks. And, thus, a reasonable jury could infer that Ms. Handley's belief that plaintiff had falsified his headcount sheets was not an honest one. The summary judgment facts are that defendant first realized that T.B. was missing around 5:00 p.m. on August 31, 2014, when Program Technician Robert Toeller performed a routine headcount and was unable to locate T.B. Defendant's GPS monitoring system reported that T.B. had cut or removed his GPS monitoring strap at 11:00 a.m. But, T.B.'s roommate reported seeing T.B. in their shared room at the facility at 2:00 p.m. And no one at the facility received an alert about a cut strap during plaintiff's shift that ended at 3:30 p.m. Viewing the facts in the light most favorable to plaintiff, the alert did not issue until 4:00 p.m. or 5:00 p.m. based on Leroy Wycoff's testimony that he recalled receiving the alert on his

phone as he was driving to work to begin his 5:00 p.m. shift. Ms. Handley explained that the Veritracks system may have delayed issuing the alert if someone had failed to clear the system of an earlier alert. She also testified that the Veritracks system is not foolproof.

A reasonable jury could conclude from these facts that Ms. Handley honestly believed that plaintiff had falsified his headcount sheet because the evidence suggests that T.B. left the facility during plaintiff's shift and thus was not present when plaintiff conducted his headcounts. But, a reasonable jury also could infer from these facts that T.B. didn't leave the facility until after plaintiff's shift had ended, so it was unreasonable for Ms. Handley to believe that plaintiff had falsified his headcount sheet. The court cannot decide this issue on summary judgment. Plaintiff thus has established a genuine issue of fact whether defendant's reason for disciplining plaintiff for the falsified headcount sheet was pretext. The court denies summary judgment on plaintiff's disparate treatment claim based on the September 2, 2014 discipline.

### 3. Plaintiff's Discipline for the Resident Found Outside Smoking and Unsupervised

Plaintiff next asserts that defendant discriminated against him based on his race when Ms. Handley issued him a written disciplinary action for allowing a resident to smoke outside of the facility unsupervised. Defendant does not dispute that plaintiff has established a prima facie case of discrimination. But, defendant asserts that it had a legitimate, nondiscriminatory reason for imposing the discipline. Defendant's policy prohibits residents to go outside unsupervised. Ms. Handley saw a resident outside of the facility smoking a cigarette and unsupervised while plaintiff was on-duty as the Program Technician. Plaintiff thus violated defendant's policy by allowing the resident to go outside unsupervised. Defendant had a legitimate, nondiscriminatory reason for disciplining plaintiff.

Plaintiff asserts that defendant's reason is pretext because he never allowed the resident to go outside unsupervised. Instead, plaintiff asserts that he was busy distributing medications to other residents and that he did not know that the resident was outside unsupervised. Plaintiff appears to dispute the fairness of the discipline, but he fails to come forward with facts showing that the discipline was pretext for race discrimination. *See Dewitt v. Sw. Bell Tele. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (explaining that the court's role "isn't to ask whether the employer's decision was wise, fair, or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs." (citations, internal quotation marks, and internal alterations omitted)). The undisputed facts are that plaintiff violated policy. He was the Program Technician on duty, and he failed to monitor one of the residents who went outside, unsupervised, to smoke. Plaintiff thus fails to demonstrate pretext. Defendant is entitled to summary judgment on this claim.

### 4. Plaintiff's Termination

Last, plaintiff asserts that defendant discriminated against him based on his race when it terminated his employment. Defendant does not dispute that plaintiff can establish a prima facie case of discrimination. Defendant contends, however, that it had a legitimate, nondiscriminatory reason for firing plaintiff. On September 2, 2014, defendant placed plaintiff on 60-days' probation for falsifying the headcount sheet. On October 30, 2014, plaintiff failed to attend a mandatory staff meeting without requesting permission to miss the meeting before it occurred. That same day, defendant terminated plaintiff's employment for failing to seek permission to miss the mandatory staff meeting and for performing poorly while on probation.

Defendant asserts that plaintiff cannot establish that its reasons for terminating plaintiff's employment were pretext. Indeed, the undisputed facts establish that plaintiff missed the

mandatory meeting and never asked defendant for permission to do so. It also is undisputed that Ms. Handley had disciplined other employees in the past for failing to attend mandatory meetings without permission. But this was not the only reason for plaintiff's termination. Defendant also terminated plaintiff's employment because he had continued to perform poorly while on probation. And, as explained above, plaintiff has come forward with sufficient evidence for a jury to infer that defendant's reason for placing plaintiff on 60 days' probation was pretext. So, a reasonable jury could infer that the probationary period was pretext, thus disbelieving one of defendant's reasons for terminating plaintiff.

The only other performance issues that plaintiff cites are the discipline plaintiff received for allowing the resident to smoke outside, unsupervised, and certain deficiencies that defendant identified in plaintiff's September 9, 2014 performance evaluation. Although the performance evaluation identified several areas where plaintiff could improve his performance, it also marked plaintiff's overall performance level as "Competent." The court cannot conclude, as a matter of law, that the reasons given for termination, standing alone, are not pretextual. On these facts, the court denies summary judgment on plaintiff's discriminatory termination claim.

## B.     Retaliation Claims

Plaintiff asserts that defendant disciplined him and terminated his employment as retaliation for complaining about race discrimination. The *McDonnell Douglas* burden-shifting framework also applies to plaintiff's Title VII, § 1981, and KAAD retaliation claims. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1174 n.7 (10th Cir. 2007) ("Title VII's standards apply to the KAAD"); *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014) (applying *McDonnell Douglas* framework to Title VII and § 1981 retaliation

claims); *Fugett v. Security Transp. Servs., Inc.*, 147 F. Supp. 3d 1216, 1234–35 (D. Kan. 2015)

(analyzing Title VII and KAAD retaliation claims using *McDonnell Douglas* framework).

Where no direct evidence of retaliation exists, plaintiff first must establish a prima facie

case of retaliation by showing that: "(1) he engaged in protected activity; (2) he suffered an

adverse employment action; and (3) there is a causal connection between his protected activity

and the adverse employment action." *Davis*, 750 F.3d at 1170 (citing *Twigg v. Hawker*

*Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011)). "The Supreme Court has . . . clarified the

causation standard for Title VII retaliation claims, explaining: '[A] plaintiff making a retaliation

claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of

the alleged adverse action by the employer.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*,

__ U.S. __, 133 S. Ct. 2517, 2534 (2013)).

Next, if plaintiff meets this prima facie burden, the burden shifts to defendant to articulate

a legitimate, non-retaliatory reason for the adverse employment action. *Crowe v. ADT Sec.*

*Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2001). And, last, where defendant satisfies this

burden, the burden shifts back to plaintiff to show that defendant's proffered reasons for its

actions are pretextual. *Id.* (citing *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006)).

Defendant argues that plaintiff cannot assert a prima facie case of retaliation because he

never engaged in protected activity. The court agrees. Plaintiff contends he opposed

discrimination when he sent Ms. Handley an email on June 7, 2015, complaining about the

schedule change that removed him from the float position. The entire text of the email is recited

in the unconverted facts section above. *See also* Doc. 33-2 at 27. But this email never alleges

that plaintiff was complaining about race discrimination. Instead, plaintiff's email asserts that it

was "unfair to change the schedule" without plaintiff's knowledge. *Id.* The email also says that

the schedule change was an inconvenience to three other people and amounted to favoritism, but it never asserted the favoritism was based on race. In his Opposition, plaintiff contends that the three other people he referenced in the email are African-American employees. But his email never states that the decision to assign the float position to a full-time Caucasian employee was discriminatory to three African-American employees. Plaintiff's email also asserts that keeping the schedule as it was "will be beneficial to the morale and well being" of employees. *Id.* In sum, plaintiff's email addresses the inconvenience and hardship of the schedule change, but never asserts that the schedule change was racial discrimination. Such complaints do not constitute protected activity. *See*, *e.g.*, *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (holding in an ADEA case that plaintiff had not engaged in protected opposition to age discrimination when he complained about the company's management and his negative performance evaluations because "[a]lthough no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the ADEA"); *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004) ("[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim."); *Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011), *aff'd*, 462 F. App'x 797 (10th Cir. 2012) (holding that complaints about working conditions that did not allege that the adverse conditions were based on sex is not protected activity under Title VII).

Also, the context of Ms. Handley's response to plaintiff's email shows that plaintiff made no complaints about race discrimination. Ms. Handley advised plaintiff that she was required to

schedule full-time employees to work 40 hours a week. She also informed plaintiff that she gave preference to employees whose primary employment was with defendant when she made the schedule. Ms. Handley never addressed any concerns about racial discrimination in her response because plaintiff had not asserted any such complaints. Because plaintiff never complained about race discrimination, he cannot establish that he engaged in protected activity—the first requirement of a prima facie case. Plaintiff's claim thus fails as a matter of law.

Plaintiff also fails to establish the third requirement of a prima facie case—a causal connection between his June 7 email and his disciplinary actions and termination. Plaintiff points to the temporal proximity between his June 7 email and the September 2 and October 15 disciplinary actions and the October 30 termination. A plaintiff may demonstrate a causal connection with evidence of temporal proximity between the protected activity and an adverse employment action. *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1191 (10th Cir. 2016). But, our Circuit has held that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation" but "a three-month period, standing alone, is insufficient to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citations omitted). Here, the first adverse action—the September 2, 2014 discipline—occurred just a few days shy of the three month mark after plaintiff sent the June 7 email. The other adverse actions—the October 15 discipline and the October 30 termination— occurred well after three months from when plaintiff sent the June 7 email. Plaintiff also cites other reasons that he believes the discipline and termination were pretextual, but he makes no connection between his June 7 email and those allegedly discriminatory actions. Without such evidence, plaintiff fails to establish a causal connection. Defendant is entitled to summary judgment on plaintiff's retaliation claim.

## IV.    Conclusion

In sum, the court concludes that a genuine dispute of material fact exists for plaintiff's disparate treatment claim based on the September 2, 2014 discipline he received for falsifying the headcount sheet and his October 30, 2014 termination.  The court thus denies defendant's summary judgment motion against these claims.  But, the court grants summary judgment against plaintiff's other disparate treatment claims.  The court also grants summary judgment against plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 31) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 5th day of September, 2017, at Topeka, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**